UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.                                          Docket No. 21-cr-10197-DPW

OMARI PETERSON

## DEFENDANT'S SENTENCING MEMORANDUM

Omari Peterson pled guilty on March 29, 2022, to one count of Distribution of and Possession with Intent to Distribute Cocaine Base and Cocaine, and two counts of Felon in Possession of Firearms and Ammunition.  He hereby submits this sentencing memorandum in support of his request for a sentence of 66 months incarceration, followed by three years of supervised release. The sentence requested is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).  As set forth below, the seriousness of Mr. Peterson's offense is substantially mitigated by his demonstrated remorse and his extraordinary rehabilitation.

The U.S. Probation Office has prepared a Pre-Sentence Report ("PSR") in this case and found that, under the Sentencing Guidelines currently in effect, the total offense level is 29.  PSR ¶ 42.  This is based on a Base Offense Level ("BOL") of 22,[1] plus upward adjustments for specific offense characteristics of (1) four levels added

---

[1] Under the Sentencing Guidelines Grouping Rules, the guideline calculation for Counts 2 and 3 (Felon in Possession of Firearms and Ammunition)  results in a higher AOL, and thus is the determinative calculation (USSG § 3D1.3(a)).  PSR ¶ 30.

because the offense involved at least 8 but not more than 24 firearms (USSG § 2K2.1(b)(1)(B)); (2) two levels added because at least 4 of the firearms were stolen (USSG § 2K2.1(b)(4)(A)); and (3) four levels added because the defendant possessed a firearm or ammunition in connection with another felony offense (USSG § 2K2.1(b)(6)(B)), for an Adjusted Offense Level ("AOL") of 32 (PSR ¶¶ 31-38). The defendant has objected to this last upward adjustment, and maintains the correct Adjusted Offense Level should be 28 (see Def. Obj. Nos. 2 and 3).

Probation has reduced the offense level by three levels for Acceptance of Responsibility (USSG § 3E1.1(a), (b)), resulting in a Total Offense Level ("TOL") of 29.  PSR ¶¶ 40-42.  Because the defendant objects to the four-level upward adjustment under USSG § 2K2.1(b)(6)(B), defendant maintains the TOL should be 25 (see Def. Obj. No. 4).

Probation has determined that Mr. Peterson's criminal history category is IV, with 7 criminal history points.  PSR ¶¶ 44-64.  Probation has calculated the defendant's advisory sentencing range at 121 - 151 months, and has noted the binding plea agreement recommendation is 66 – 90 months. Using defendant's calculation of a TOL of 25, the advisory sentencing range would be 84 – 105 months (see Def. Obj. No. 9).

A sentence within the advisory guideline range is far in excess of what is fair and just in this case.  A sentence of 66 months and a term of supervised release is the just result.

## I.      Mr. Peterson's Background

Omari Peterson is a 40-year-old Black male.  Born and raised in Boston, his

childhood was marred by physical abuse.  His father, who was trained in martial

arts, beat Omari, his mother, and his brother and sister.  At times the police were

called, including in 1992 when Omari was 10, after which his father moved out of

the home.  He also had a difficult relationship with his mother, who was both

physically and verbally abusive.  Despite this, his parents did care about their

children.  Although they were poor, both parents worked to support the family.

Omari reports that his father punished them violently and physically, he did so "so

that others did not mess with them."  PSR ¶ 94.  His mother wanted to keep him

out of the streets.  PSR ¶ 95.

Omari attended counseling at Boston Children's Hospital on and off between

1992 and 1994, initially due to anxiety he felt due to conflicts between his parents

and their separation.  PSR ¶ 126.  He was again referred to counseling in 1994, as

there was an allegation that he may have set a fire at his school.[2]  Clearly Omari

struggled as a youth, and he was diagnosed with moderate childhood anti-social

behavior.  PSR ¶ 126.

He attended three different high schools, eventually dropping out during the

eleventh grade.  He left because he was working, hanging out with friends, and

living back-and-forth between the homes of his sister and mother.  He is very proud

that he was able to obtain his GED in 2011.  He also went on to trade school and

received an HVAC degree.  He is hoping to obtain further vocational training and

have a career when he is released, either working on cars or cooking, two things he

---

[2] Documentation reflects that Omari denied setting the fire, and his parents believed him, noting that he had been doing well overall at school and home.  PSR ¶ 126.

loves to do.

Omari is very family-oriented, as is seen by the number of support letters
that friends and family have submitted on his behalf.

## II.     The Sentencing Framework

While the PSR calculation of the guidelines sentence advises lengthy
incarceration, this Court retains the responsibility for individualized sentencing.
Even under the previous regime of mandatory guidelines, which has been declared
unconstitutional, the Supreme Court has explained that a sentencing court should
"consider every convicted person as an individual and every case as a unique study
in human failings that sometimes mitigate, sometimes magnify, the crime and the
punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The Court should impose a sentence that is sufficient, but not greater than
necessary, to achieve the goals of sentencing, by considering the factors enumerated
in 18 U.S.C. § 3553(a).  In the advisory guidelines regime, it is now well established
that the guidelines serve only as a starting point in the Court's analysis, and should
not be presumed to yield the appropriate sentence in any given case.  *See Nelson v.
United States*, 555 U.S. 35, 351 (2009); *Gall v. United States*, 552 U.S. 38, 49 (2007).

The Court should ultimately arrive at an appropriate sentence after a holistic
consideration of deterrence (both specific and general), public protection, just
punishment, and rehabilitation.  As far as deterrence is considered, both specific
and general, 66 months is a substantial sentence that will deter Mr. Peterson and
others from engaging in similar conduct.

It should also be recognized that it is the certainty and swiftness of punishment that can have a substantial deterrent affect, more than the sentence's severity.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence."  *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:  Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-448 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity:  An Analysis of Recent Research* (1999) summary available at http://members.multimania.co.uk/lawnet/SENTENCE.PDF.  The report, commission by the British Home Office, examined penalties in the United States as well as several European countries.  *Id.* at 1.  It examined the effects of changes to both the certainty and severity of punishment.  *Id.*  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance."  *Id.* at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentence is

capable of enhancing deterrent effects." *Id*. at 1.

Mr. Peterson has already taken very significant steps towards rehabilitation. He was lucky to have participated in the initial Restorative Justice ("RJ") Program for people who were incarcerated, and he found it life-changing.  His eyes have been opened, and he understands he cannot minimize his role in what he has done that has hurt real people.  He attend two RJ sessions:  one last December that was for three days, eight hours per day; and a second in April of this year that ran for six weeks and met for two and one-half hours each Wednesday.  He is hopeful that there will be a third session where he can meet with people who have suffered from addictions and hopefully make amends.

The sentencing of a defendant (at least since <u>Booker</u>) is not a mechanical exercise based purely on objective criteria.  Rather, these sentencing factors call for the use of subjective judgment, <u>i.e.</u>, the exercise of judicial discretion based on consideration of the human condition and the vagaries of human conduct.  In essence, these factors express the "just desserts" concept of justice.  As stated in the Senate Report that was part of the Sentencing Reform Act, "It is another way of saying that the sentence should reflect the gravity of the defendant's conduct."  Sen. Rep. 98-225 at 75 (1984), <u>as</u> <u>reprinted</u> <u>in</u> 1984 U.S.C.C.A.N. 3182, 3258.  The sentence should thus reflect both the public's interest in the harm done and the defendant's interest in avoiding an unreasonably harsh sentence under all the circumstances of the case.  <u>Id</u>.

Defendant notes, however, that deterrence and punishment goals of

sentencing are only part of the equation, albeit that focused on by the prosecution.

Incarceration has consequences that must be taken into consideration.  These

consequences, often only dimly foreseen at sentencing, have a tremendous impact,

not only on the offender, but also on families, communities, and on the nation as a

whole. On a broad scale, imprisonment today typically involves felony convictions of

poor and minority defendants, often for charges involving drugs.  Some of the

consequences of a felony conviction are well known – longstanding restrictions on

travel, firearms ownership, and voting – but many additional restrictions have been

enacted in laws passed since the beginning of the "get tough" movement in the

1980s.  There have been hundreds of changes to state and federal law that impose

additional penalties on felons, penalties that also impact families and the

communities from which the majority of today's felons come. These include laws

limiting access to public housing, federal educational benefits, jobs, and job

training.[3]

As noted by Professor Jonathan Simon in commenting on former New York

City police chief Bill Bratton's statement that, "you can't just arrest your way out of

a problem," Bratton and the New York effort he led in the 1990s is perhaps best

known for using effective policing to drive down reliance on incarceration, thus

helping New York to become the leading state thus far to have abandoned the

---

[3] See Mauer, M. and M. Chesney-Lind (eds.), Invisible Punishment:  The Collateral Consequences of Mass Imprisonment, New York:  New Press, 2002, for a collection of articles focusing attention on these issues.  See also, Rios, V., Punished:  Policing the Lives of Black and Latino Boys, New York Univ. Press 2011.

practice of mass incarceration which is destroying government and society in

California and much of the nation.[4]

Mr. Peterson asserts that a sentence of 66 months, which is over three times

the amount of time he has previously been incarcerated, will provide deterrence,

just punishment for his crime, yet also take into consideration the collateral

consequences of imprisonment

## Conclusion

For all the reasons cited herein, the Court should impose a sentence of 66

months, followed by three years of supervised release.

Respectfully submitted,

OMARI PETERSON
By his attorney,

/s/ *Mark W. Shea*                                   Dated:  November 8, 2022
Mark W. Shea
929 Massachusetts Avenue, Suite 200
Cambridge MA  02139-3134
617.577.8722
markwshea@shearock.com

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic
Filing (NEF) and paper copies will be sent to those indicated as non-registered
participants on November 8, 2022.

/s/ Mark W. Shea           

---

[4] Available at http://governingthroughcrime.blogspot.com/2011/08/chairman-of-board.html.

MARK W. SHEA